IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

UNITED STATES OF AMERICA,    *

    v.    *    CRIMINAL NO.: WDQ-14-0089

DARIAN DARNELL LISBON.    *

\* \* \* \* \* \* \* \* \* \* \* \* \*

MEMORANDUM OPINION

Darian Darnell Lisbon is charged with being a felon in possession of a firearm. ECF No. 1. Pending are Lisbon's motions to suppress tangible evidence, ECF No. 19, and to suppress oral statements, ECF No. 20. A hearing was held on Monday, July 21, 2014. For the following reasons, the motions to suppress will be denied.

I. Background

    A. Facts[1]

Some time in the morning on December 22, 2013, 22 year old Lisbon called Baltimore Sedan service to request a taxi. *See* Tr. at 312, 327. Derrell Pitts--a driver employed as a private contractor with Baltimore Sedan--picked up Lisbon in Pitts's black 1998 Toyota Avalon and drove him to a destination on Caroline Street. *See id.* at 278-79, 299. Later that morning,

---

[1] The facts are taken from the hearing and the government's opposition and supporting exhibits.

Lisbon called Pitts directly for a ride, and Pitts picked him up again. *See id.* at 299-300, 312.

Baltimore City Police Officer Tara Russ began to follow Pitts in her patrol car in the 1800 block of Caroline Street, because she noticed that the Avalon's left taillight was inoperable.[2] *See id.* at 5-11; Gov. Ex. 22. At 11:24 a.m., Officer Russ stopped the Avalon in the 2100 block of Harford Road. *See* Tr. at 9, 24. Officer Russ called in the stop, and then approached Pitts to obtain his license and registration. *See id.* at 23-25, 289. Officer Russ observed Lisbon seated alone in the backseat of the car. *See id.* at 20.

Officer Russ returned to her patrol car to check Pitts's license and registration. *See id.* at 21-22. In the meantime, Officers Ricardo Burrell and Joseph Rodgers arrived separately to assist in the stop, pursuant to standard police back-up procedures. *See id.* at 5, 26-28, 55-56, 161-62. Officer Rodgers parked his car behind Officer Russ's car, and Officer Burrell parked his car in front of the Avalon. *See id.* at 18. Officer Burrell testified that--as he approached the Avalon--he

---

[2] Maryland law requires all cars to have working taillights:

> [E]very motor vehicle . . . shall be equipped with at least 2 tail lamps mounted on the rear, which, when lighted as required in § 22-201.1 of this subtitle, shall emit a red light plainly visible from a distance of 1,000 feet to the rear.

Md. Code Ann., Transp. § 22-204 (West 1989).

saw Lisbon remove his seat belt, pull up the lock on the passenger door,[3] look around, and reach toward the floor. *See id.* at 165, 182, 185. Officer Rodgers observed that Lisbon was fidgeting and dipping his shoulder toward the floor.[4] *See id.* at 232. The officers suspected that Lisbon was trying to hide something, potentially contraband. *See id.* at 190; Gov. Ex. 18. The officers approached the passenger door together to confront Lisbon about their suspicions. *See* Tr. at 28, 250.

Officer Burrell opened the passenger door and asked[5] Lisbon to exit the car.[6] *See* Tr. at 314. Officer Burrell asked Lisbon for identification, but he had none. *See id.* at 316. He then asked Lisbon to identify himself, and Lisbon told them his name and birth date. *See id.* Officer Burrell next asked Lisbon if

---

[3] Lisbon testified that he was not wearing a seatbelt. Tr. at 313. Pitts testified that the Avalon had button locks, and that the locks on the rear passenger doors were broken. *See* Tr. at 283.

[4] Officer Rodgers did not notice whether Lisbon was wearing a seatbelt or whether he unlocked the car. *See* Tr. at 233-34, 246.

[5] Officers Burrell and Rodgers testified that Officer Burrell asked--not ordered--Lisbon to exit the car. *See* Tr. at 191-92, 249. However, the statement of charges--written by Officer Russ with input from the other officers at the scene--stated that Officer Burrell ordered Lisbon to exit the car. *See, e.g.*, Tr. at 210-12; Gov. Ex. 22 at 2.

[6] Lisbon testified that, as he began to exit, Officer Burrell gently grabbed his elbow and escorted him out of the car. *See* Tr. at 297, 316. The officers testified that they did not touch Lisbon as he exited the car. *See id.* at 167, 248-49.

he had anything on his person that the police should "know about." *See id.* at 319-20. In response, Lisbon lifted his hands and stated: "No, you can look. All I have is my fronts."[7] *See id.* at 168, 197. Although Officer Rodgers had consent to search forms in his patrol car at the scene of the traffic stop, he did not obtain a signed consent form from Lisbon for the search. *See id.* at 254-55. However, both officers testified that Lisbon orally gave his permission to be searched.[8] *See id.* at 168, 197, 235-39.

Officer Rodgers began searching from the top of Lisbon's body. *See id.* at 238. Lisbon did not object to Officer Rodgers's actions at any time during the search. *See id.* at 265. When Officer Rodgers searched Lisbon's sweatshirt pockets, he found two small zip lock baggies containing white powder--which was later confirmed to be cocaine.[9] *See id.* at 321; Gov.

---

[7] "Fronts" is a street term for gold front teeth covers. *See* ECF No. 23 at 3; Gov. Ex. 18. Lisbon denied making that statement and denied consenting to a search. *See* Tr. at 324, 329-30.

[8] Officer Russ did not hear the interaction between the officers and Lisbon before the search occurred. *See* Tr. at 67-68, 149-50.

[9] Officer Burrell testified that he placed his hands under Lisbon's elbows during the search. *See* Tr. at 169-70. Officer Rodgers testified that Officer Burrell was not touching Lisbon during the search. *See id.* at 249-51. Lisbon stated that--before the search--Officer Burrell ordered him to place his hands on his head, and--during the search--Officer Burrell placed one hand on top of Lisbon's hands and held the back of Lisbon's sweat pants with his other hand. *See id.* at 319.

Case 1:14-cr-00089-WDQ   Document 37   Filed 07/22/14   Page 5 of 16

Ex. 18. Officer Rodgers stopped the search, placed Lisbon under arrest for possession of controlled substances, handcuffed him, and ordered him to sit on the curb. *See* Tr. at 71, 171. The officers did not draw their weapons at any point during the encounter. *See id.* at 48-49, 262.

Some time after the search, Officer Russ issued Pitts a citizen contact form, which indicated that he had a broken taillight.[10] *See id.* at 29; Gov. Ex. 17. Officer Russ then told Pitts that he was free to leave. *See* Tr. at 32.

Officer Deonte Duck arrived after Lisbon's arrest. *See* ECF No. 23 at 4. Lisbon asked the officers if he could sit in Officer Russ's patrol car, rather than on the curb, and stood up. *See id.* Officer Duck saw a large gun-shaped object slide down Lisbon's lower right pants leg as he stood up. *Id.* Officer Duck recovered the object--a loaded Smith & Wesson .40 caliber semi-automatic handgun[11]--from Lisbon. *Id.* at 4-5.

B. Procedural History

On February 19, 2014, Lisbon was indicted on: (1) one count of being a felon in possession of a firearm, in violation of 18

---

[10] Although Officer Russ often issues repair orders when stopping cars for mechanical problems, she did not issue a repair order to Pitts. *See* Tr. at 50-53.

[11] Law enforcement subsequently discovered that the handgun was stolen in November 2011 from a firearm dealer in Shrewsbury, Pennsylvania. ECF No. 23 at 5; Gov. Ex. 21.

U.S.C. § 922(g)(1);[12] and (2) one count of possessing a stolen firearm, in violation of 18 U.S.C. §§ 922(j), 924(a)(2).[13] *See* ECF No. 1.  On March 14, 2014, Lisbon was arraigned and pled not guilty.  ECF No. 7.

On April 28, 2014, Lisbon moved to suppress tangible evidence.  ECF No. 19.  The same day, Lisbon moved to suppress his oral statements.  ECF No. 20.  On May 1, 2014, the government opposed Lisbon's motions.  ECF No. 23.  On July 21, 2014, the Court held a hearing on the defendant's motions.

II. Analysis

    A. Motion to Suppress Statements

Lisbon contends that--at the time he gave his consent to search--he "reasonably believed that he was in custody, and therefore under arrest," and thus the police were required to give him *Miranda* warnings before questioning him.  *See* ECF No. 20 at 2-3.  The government argues that, because Lisbon was not in custody when he was questioned, *Miranda* warnings were not required.  *See* ECF No. 23 at 9.

---

[12] Lisbon has two previous felony drug trafficking convictions. *See* Tr. at 326.

[13] On the morning of trial, the government stated that it would drop count two--possession of a stolen firearm.  Tr. at 2-3.

On June 25, 2014, the government filed a superseding indictment, adding a third count of cocaine possession, in violation of 21 U.S.C. § 844(a).  ECF No. 28.  On the morning of trial, the government stated that it would not pursue this charge, because Lisbon had not been arraigned on it.  Tr. at 2.

To protect a suspect's right against self-incrimination, police must provide *Miranda* warnings before beginning custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Persons who are temporarily detained during ordinary traffic stops are not in custody for *Miranda* purposes, unless detained "to a degree associated with formal arrest." *See Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S. Ct. 3138, 3150, 82 L. Ed. 2d 317 (1984) (internal quotations omitted).

Here, the traffic stop took place in the middle of the day on a public street. *See* ECF No. 23 at 2; Gov. Ex. 22. Lisbon was questioned after he was ordered out of the car during the traffic stop of the sedan, but before he was placed under arrest. *See* ECF No. 23 at 3. Because this questioning took place during a routine traffic stop--and Lisbon was not yet restrained to the degree of a formal arrest--Lisbon was not in custody and no *Miranda* warnings were required.[14] *See, e.g.*,

---

[14] Lisbon contends that he was in custody, because he "did not feel free to end the encounter or to leave the area," and thus "in his mind," he was under arrest. *See* ECF No. 20 at 1. However, even though a motorist is "seized" for Fourth Amendment purposes during a routine traffic stop--and is thus "detained and not free to leave"--routine traffic stops do not implicate the concerns underlying *Miranda*, so a "motorist is not 'in custody' for *Miranda* purposes." *See United States v. Sullivan*, 138 F.3d 126, 130-31 (4th Cir. 1998); *see also United States v. Elston*, 479 F.3d 314, 319 (4th Cir. 2007) ("[T]he perception that one is not free to leave is insufficient to convert a *Terry*

7

*United States v. Leshuk*, 65 F.3d 1105, 1109-10 (4th Cir. 1995) ("[D]rawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for *Miranda* purposes."); *Sullivan*, 138 F.3d at 132 (defendant was not in custody for *Miranda* purposes during routine traffic stop because nothing the officer said or did suggested that the defendant was under arrest, and the stop "occurred at midday on the side of a highway in full public view") (citing, inter alia, *Berkemer*, 468 U.S. at 421, 104 S. Ct. at 3140 (routine traffic stops generally are not custodial, in part, because they are conducted in public in an atmosphere that is "substantially less 'police dominated' than the types of interrogations with which *Miranda* was concerned")). Suppression of Lisbon's statements is not warranted; the motion to suppress statements will be denied.

B. Motion to Suppress Tangible Evidence

Lisbon argues that the drugs and gun should be suppressed, because the traffic stop, the order to exit the vehicle, the initial search of Lisbon that revealed the drugs, and the second search of Lisbon that revealed the gun violated the Fourth Amendment. *See* ECF No. 19 at 3. The government contends that

---

stop into an arrest. A brief but complete restriction of liberty is valid under *Terry*.") (internal quotations omitted).

each of these searches and seizures was lawful, and thus suppression is unwarranted. See ECF No. 23 at 6-8, 13-18.

The Fourth Amendment[15] prohibits unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 8, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Fourth Amendment reasonableness inquiries are fact-intensive. *See Franklin v. Montgomery County*, DKC-05-0489, 2006 WL 2632298, at *13 (D. Md. Sept. 13, 2006).

1. Reasonableness of Stop

The government argues that the traffic stop was lawful, because it was based on Officer Russ's observation of a violation of the traffic laws. See ECF No. 23 at 7-8. The defendant contends that the stop was unlawful, because it was purely pretextual, "and not predicated on any violation of the law." See ECF No. 19 at 1, 3; Tr. at 334-35.

"When a police officer stops an automobile and detains the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment." *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011). An officer may lawfully make a traffic stop if she observes a violation of traffic laws, *Whren v. United States*, 517 U.S. 806, 812, 116 S. Ct. 1769, 135

---

[15] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

L.Ed.2d 89 (1996), or if she had probable cause or a reasonable suspicion to believe that a traffic violation occurred, *United States v. Williams*, 740 F.3d 308, 313 (4th Cir. 2014). An officer's subjective motive for conducting a traffic stop is irrelevant if, objectively, she had reasonable suspicion to make the stop. *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996); *Digiovanni*, 650 F.3d at 506.

Officer Russ stopped the Avalon, because she observed that one of its taillights was inoperable, in violation of Md. Code Ann., Transp. § 22-204. *See* Tr. at 5-11; Gov. Ex. 22. Thus, the traffic stop of the Avalon was reasonable. *See, e.g.*, *United States v. Lewis*, 466 F. App'x 170, 172 (4th Cir. 2012) (traffic stop was lawful when officers stopped the car because it had a "defective tag light," in violation of North Carolina law).

Ordering Lisbon to exit the Avalon during the stop also did not violate the Fourth Amendment, because--during a lawful traffic stop--officers may order any of the car's occupants to exit the car. *Maryland v. Wilson*, 519 U.S. 408, 415, 117 S. Ct. 882, 886, 137 L. Ed. 2d 41 (1997); *United States v. Vaughan*, 700 F.3d 705, 710 (4th Cir. 2012).

2. Reasonableness of First Search

The government contends that the first search of Lisbon--which led to the discovery of the baggies of cocaine--was

justified by his consent. *See* ECF No. 23 at 16-17. Lisbon contends that that search was unreasonable, because he did not consent to the search and the search was overly "intrusive."[16] *See* ECF No. 19 at 2-3.

Ordinarily, the Fourth Amendment requires the police to obtain a warrant before conducting a search. *Schneckloth*, 412 U.S. at 219, 93 S. Ct. at 2043. However, consent to a search is an exception to the Fourth Amendment's warrant requirement, *see id.*, and is valid if it is "(1) knowing and voluntary and (2) given by one with authority to consent," *United States v. Buckner*, 473 F.3d 551, 554 (4th Cir. 2007) (internal quotations and citations omitted). Consent is voluntary if--under a totality of the circumstances--it represents the suspect's "essentially free and unconstrained choice." *See United States v. Watson*, 423 U.S. 411, 424, 96 S. Ct. 820, 828, 46 L. Ed. 2d 598 (1976). Factors indicating whether consent was voluntary include "the characteristics of the accused (such as age, maturity, education, intelligence, and experience) and the conditions under which the consent to search was given (such as

---

[16] Even if Officer Rodgers's search exceeded the scope of a permissible weapons search under *Terry*, a person may consent to a search with a greater scope than that which would otherwise be allowed under *Terry*. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 2048, 36 L. Ed. 2d 854 (1973) ("In situations where the police have some evidence of illicit activity, but lack probable cause to arrest or search, a search authorized by a valid consent may be the only means of obtaining important and reliable evidence.").

the officer's conduct, the number of officers present, and the duration of the encounter)." *United States v. Boone*, 245 F.3d 352, 361-62 (4th Cir. 2001).

Once consent is given, any search within the scope of that consent is reasonable. *See United States v. Ortiz*, 669 F.3d 439, 445 (4th Cir. 2012). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood" to be the scope of consent "by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S. Ct. 1801, 1803-04, 114 L. Ed. 2d 297 (1991).

Clearly, Lisbon had authority to consent to a search of his person. In response to Officer Burrell asking if he had anything on his person that he should "know about," Lisbon--who was not under arrest at the time--raised his hands and responded "No, you can look. All I have is my fronts." *See* Tr. at 168, 197. At the time of the stop--which occurred on a public street in the middle of the day--Lisbon, a 22 year old adult with previous experience with law enforcement, testified that he had understood the officers' questions. *See id.* at 9, 24, 326-29. Although there were three officers present during the stop, only two officers questioned Lisbon, and the drugs were recovered within minutes after the stop. *See* Tr. at 58, 72-73; Gov. Ex.

12

20. Neither Lisbon,[17] nor the officers, indicated that Officers Burrell or Rodgers used coercion or threats to obtain Lisbon's consent, and their weapons were not drawn.[18] *See* Tr. at 48-49, 262. Thus, Lisbon's consent was voluntarily given.[19]

Officer Rodgers searched the pockets of Lisbon's clothes and discovered the cocaine in his sweatshirt pocket. *See* Tr. at 321; Gov. Ex. 18. By raising his hands and telling the officer that he could "look" at Lisbon's person for hidden items, a reasonable person would have understood the scope of consent to at least include the pockets of Lisbon's outer clothing. *See, e.g., United States v. Stinson*, 468 F. App'x 285, 288 (4th Cir. 2012) *cert. denied*, 133 S. Ct. 368, 184 L. Ed. 2d 218 (U.S. 2012) (reasonable person would understand that the scope of defendant's consent to a search of his "person" included both a

---

[17] Lisbon stated that the officers did not "push [him] around" or "use vulgarities" during the encounter. Tr. at 333.

[18] Even if Lisbon was ordered out of the car by Officer Burrell, he was not ordered to permit the search. *See* Tr. at 319-20.

[19] *See, e.g., Ortiz*, 669 F.3d at 442 (consent voluntarily given when--during an investigatory traffic stop after the defendant had been ordered out of his vehicle--officer requested permission to search the defendant's car for drugs and the defendant said they were "free to search"); *United States v. Davis*, 645 F. Supp. 2d 541, 551 (W.D.N.C. 2009) *aff'd*, 460 F. App'x 226 (4th Cir. 2011) (consent was voluntarily given, because, *inter alia*, stop occurred in public, officers did not draw weapons or threaten the defendant, the defendant cooperated during the search, and there was no indication that the defendant was inexperienced with law enforcement or mentally deficient).

pat-down for weapons and a search of the defendant's pockets). Further, Lisbon did not object to Officer Rodgers's actions while he was being searched, also indicating that the scope of Lisbon's consent included a search of his pockets. *See United States v. Jones*, 356 F.3d 529, 534 (4th Cir. 2004) ("[A] suspect's failure to object (or withdraw his consent) when an officer exceeds limits allegedly set by the suspect is a strong indicator that the search was within the proper bounds of the consent search.") (*citing United States v. Mendoza-Gonzalez*, 318 F.3d 663, 670 (5th Cir.), *cert. denied*, 538 U.S. 1049, 123 S. Ct. 2114, 155 L.Ed.2d 1091 (2003) ("A failure to object to the breadth of the search is properly considered an indication that the search was within the scope of the initial consent." (internal quotation marks omitted)).

Accordingly, the search of Lisbon's person was reasonable, and there is no basis for suppression of the drugs.

### 3. Reasonableness of Second Search

The government argues that the second search of Lisbon was reasonable, because there was probable cause to arrest Lisbon, and the search occurred incident to his arrest. See ECF No. 23 at 15-16.

The Fourth Amendment permits a police officer to lawfully arrest a person in a public place without a warrant--and to search him incident to the arrest--if the officer has probable

cause to believe that person is involved in criminal activity. *See United States v. Dickey-Bey*, 393 F.3d 449, 453 (4th Cir. 2004) (citations omitted); *United States v. Currence*, 446 F.3d 554, 556 (4th Cir. 2006). Probable cause justifying an arrest "means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Dickey-Bey*, 393 F.3d at 453 (*quoting Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979) (internal quotation marks omitted)). Whether there is probable cause to arrest depends on the totality of the circumstances. *Id.* (*citing Illinois v. Gates*, 462 U.S. 213, 230, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)).

Here, there was probable cause to arrest Lisbon for drug possession, because Officer Rodgers had just removed from Lisbon's pockets two baggies containing white powder that resembled cocaine.[20]  See ECF No. 23 at 3-4; Gov. Ex. 18. Lisbon was searched within minutes after his arrest,[21] and Officer Duck recovered the gun. See ECF No. 23 at 4. Because the second

---

[20] Although the statement of probable cause written by Officer Russ after Lisbon's arrest may have inaccurately stated that Officer Burrell ordered--rather than asked--Lisbon to exit the car, this minor inaccuracy did not negate probable cause for the charges, which was based on the recovery of the drugs and gun.

[21] *See* Tr. at 177.

search was incident to Lisbon's lawful arrest, it was reasonable, and there is no basis for suppression of the gun.

III. Conclusion

For the reasons stated, the Court will deny Lisbon's motions to suppress.

_7/22/14_  
Date

_/s/ William D. Quarles, Jr._  
William D. Quarles, Jr.  
United States District Judge